Erin Rose Ronstadt, SBN 028362
Kevin Koelbel, SBN 016599
Clayton W. Richards, SBN 029054
OBER PEKAS RONSTADT, PLLC
3030 N. 3rd Street, Suite 1230
Phoenix AZ 85012
Phone: (602) 277-1745
Fax: (602) 761-4443
erin@oberpekas.com
kevin@oberpekas.com
clayton@oberpekas.com

Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Dona Port,<br><br>　　　　Plaintiff,<br><br>v.<br><br>Hotchalk, Inc. Long-Term Disability Plan, an ERISA benefit plan; Aetna Life Insurance Company, a plan fiduciary; and Hotchalk, Inc., the plan administrator,<br><br>　　　　Defendants. | No.<br><br>**COMPLAINT** |

For her claims against Hotchalk, Inc. Long-Term Disability Plan (the "Plan"), Aetna Life Insurance Company ("Aetna"), and Hotchalk, Inc. ("Hotchalk") (collectively, "Defendants"), Plaintiff Dona Port ("Ms. Port" or "Plaintiff") alleges as follows:

*Jurisdiction, Venue And Parties*

1.　This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA").

2.　The Plan, number 501, is a purported ERISA benefit plan established and maintained by Hotchalk for the benefit of its employees.

3.　Ms. Port was a participant and beneficiary of the Plan as an employee of Hotchalk.

4.　Hotchalk is the Plan Sponsor, Plan Administrator, a Plan fiduciary, and employer.

5. Aetna is a Plan fiduciary and a third-party claims administrator for the Plan.

6. Hotchalk and Aetna have a duty to administer the Plan prudently and in the best interests of all Plan participants and beneficiaries.

7. Ms. Port, an employee of Hotchalk and an eligible employee under the Plan, filed a claim for long-term disability ("LTD") benefits on July 6, 2015, for disability beginning March 24, 2015.

8. Ms. Port also qualified for life insurance waiver of premium ("LWOP") benefits under a separate life insurance policy administered b y Aetna.

9. At the time Ms. Port sought LTD benefits under the Plan, Aetna administered claims for Hotchalk under the Plan, acted on behalf of the Plan, and acted as an agent of Hotchalk and/or the Plan to make final decisions regarding the payment of disability benefits for the Plan and to administer the Plan.

10. Ms. Port currently resides in Maricopa County, Arizona and has been a resident of Maricopa County at all times since becoming a Plan participant.

11. The Plan and Hotchalk have their principal place of business in the State of California.

12. Aetna has its principal place of business in the State of Connecticut.

13. Aetna's group life and disability insurance business is in the process of being acquired, or has already been acquired, by Hartford Life & Accident Insurance Company, a group benefits operating subsidiary of Hartford Financial Services Group, otherwise known as "The Hartford."

14. The Hartford also has its principal place of business in the State of Connecticut.

15. Defendants Aetna and Hotchalk are licensed and authorized to do business in Maricopa County, Arizona, and reside and are found within Maricopa County within the meaning of the jurisdiction and venue provisions of ERISA, 29 U.S.C. § 1132 and 28 U.S.C. § 1391.

16. This Court has jurisdiction over the subject matter of this action under

ERISA, 29 U.S.C. §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

17. Venue is proper in this Court under ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

### *Ms. Port's Disability*

18. Ms. Port suffers from several severe medical conditions including systemic lupus erythematosus ("SLE"), osteoarthritis in her hands, cervical degenerative disc disease, and migraine headaches.

19. Ms. Port has reported and exhibits symptoms of SLE, which include fatigue, joint pain, joint stiffness, headaches, and cognitive deficits.

20. Ms. Port also experiences hand pain, numbness, and weakness.

21. Ms. Port's medical records document tenderness in her hands and fingers and enlarged joints diffusely in both hands.

22. Diagnostic testing also confirmed sensory peripheral neuropathy in Ms. Port's upper extremities.

23. Diagnostic imaging of Ms. Port's hands revealed moderate degenerative osteoarthritis.

24. Diagnostic imaging of Ms. Port's cervical spine revealed degenerative disc disease ("DDD") resulting in nerve root involvement.

25. Ms. Port underwent an anterior discectomy and fusion of the cervical spine at the C3-C4 and C4-C5 levels in October 2017 to address symptoms of cervical DDD.

26. Ms. Port also suffers from fibromyalgia.

27. Ms. Port has exhibited 17 of 18 possible fibromyalgia tender points upon examination by specialist treatment providers.

28. Ms. Port experiences widespread pain and meets the diagnostic criteria for fibromyalgia.

29. Ms. Port also experiences severe migraines characterized by throbbing, sharp, pressure-like, and stabbing pain behind her eyes and around her head.

30. When experiencing a migraine, Ms. Port reports sensitivity to light and sound.

31. Ms. Port experiences approximately two migraines per month.

32. These conditions, and others, cause Ms. Port limitations that preclude her from sustaining her Own Occupation or Any other occupation.

33. Ms. Port cannot work of any nature consistently 8 hours each day, 40 hours a week.

*Plan Language*

34. During the first 24 months of disability, a claimant is deemed totally disabled "if, as a result of a disease or injury, [the claimant is] unable to perform with reasonable continuity the substantial and material acts necessary to pursue [the claimant's] own occupation and [the claimant is] not working in [the claimant's] own occupation.

35. After 24 months of disability, a claimant is deemed totally disabled, "if, as a result of a disease or injury, [the claimant is] not able to engage with reasonable continuity in any occupation in which [the claimant] could reasonably be expected to perform satisfactorily in light of [the claimant's] age, education, training, experience, station in life, and physical and mental capacity that exists within any of the following locations:

- a reasonable distance or travel time from [the claimant's] residence in light of the commuting practices of [the claimant's] community; or
- a distance or travel equivalent to the distance or travel time [the claimant] traveled to work before becoming disabled; or
- the regional labor market, if [the claimant] reside[s] or resided prior to becoming disabled in a metropolitan area.

36. "Own Occupation" is defined as "the occupation that [Ms. Port is] routinely performing when [her] period of disability begins."

37. Aetna and Hotchalk provided a document titled "Your Summary of Long-Term Disability (LTD) Benefits" to Ms. Port that contains different definitions of total disability.

*Ms. Port's Employment*

38. Hotchalk employed Ms. Port as an "Enrollment Specialist" beginning on

-4-

February 24, 2014.

39. As an "Enrollment Specialist," Ms. Port was responsible for contacting prospective clients for Hotchalk's Masters in Education degree programs through consultative enrollment and admissions processes.

40. The job's objectives included providing clients with customer service; acting as a "personal coach/advisor" and helping students qualify for admissions, selecting a degree, completing the enrollment process and making a smooth transition into a graduate level program; effectively managing "a book of candidates;" becoming familiar with degree programs; and being efficient in company processes.

41. Ms. Port worked in this position until March 23, 2015, her date of disability.

42. Shortly after her last date of work, Ms. Port applied for and received short-term disability ("STD") benefits through Anthem Blue Cross.

43. At the expiration of her STD benefits, Ms. Port applied for LTD benefits through Aetna, the third-party claims administrator and Plan fiduciary.

44. Ms. Port's reported impairments included spinal stenosis, fibromyalgia, lupus, and a history of treatment for a cervical spine impairment resulting from a motor vehicle accident.

45. She reported that her pain and physical symptoms were exacerbated when her husband passed away.

46. On August 13, 2015, Aetna approved Ms. Port's LTD claim effective June 22, 2015, which was the end of the maximum STD benefit period.

47. Aetna awarded LTD benefits on the basis of Ms. Port's "pain, fatigue, and the effects of the medication used to treat these symptoms."

### *Ms. Port's LTD and LWOP Benefits*

48. On May 17, 2017, after almost two years of benefits under the Own Occupation definition of disability, Aetna notified Ms. Port it was terminating her LTD benefits (the "Denial").

49. Aetna relied upon the review of a non-examining reviewer to support its

-5-

conclusion that "[t]he documentation fails to support limitations that would preclude [her] from working in a sedentary capacity."

50. Aetna noted in the Denial that the February 2017 cervical MRI revealed a "foraminal disc herniation with foraminal narrowing likely contacting the left C7 nerve root," and the March 2017 hand x-rays illustrated carpal-metacarpal osteoarthritis, left more severe than right.

51. The Denial also referenced exam findings of 17 out of of 18 possible fibromyalgia tender points.

52. Aetna dismissed Ms. Port's cervical DDD because there was no "severe stenosis or neural compromise," but as mentioned previously, Ms. Port underwent a cervical spine surgery only five months later.

53. On May 26, 2017, Aetna terminated Ms. Port's LWOP benefits under the Plan.

54. Around the time of the Denial, in a phone conversation with Ms. Port, an Aetna representative misled Ms. Port into believing her LTD benefits were paid erroneously, and that she never should have been approved in the first place.

55. The Aetna representative stated that many people work with back problems and that Ms. Port was unaware of the Aetna representative's own medical problems that she works with.

56. Moreover, the Denial came only three months before the transition of Ms. Port's LTD claim into the "any occupation" period of disability.

57. On December 19, 2017, Ms. Port appealed both Aetna's LTD and LWOP terminations.

58. In her appeal, Ms. Port noted the several Attending Physicians Statements and Capabilities and Limitations Worksheets completed by her treating pain management specialist, Dr. Jin Yuk, who repeatedly concluded Ms. Port has severe work-related limitations that preclude her from performing any work.

59. Ms. Port also submitted the report of vocational specialist Mark Kelman,

M.S., C.R.C., C.V.E., who concluded on December 8, 2017 that Ms. Port was not "competitively employable based on the residuals of her Lupus, fibromyalgia, and multiple medications taken on a regular and ongoing basis."

60. In a letter dated February 27, 2018, however, Aetna upheld its prior decision to terminate LTD and LWOP benefits (the "Final Denial").

61. In the Final Denial, Aetna quoted and relied on the following incorrect definition of Total Disability:

> You are deemed to be totally disabled while either of the following applies to you:
>
> - During the period which ends right after the first 24 months benefits are payable in a period of total disability:
>
>   You are not able, solely because of injury or disease, to perform the material duties of your own occupation; except that if you start work at a reasonable occupation you will no longer be deemed totally disabled.
>
> - Thereafter during such period of total disability:
>
>   You are notable, solely because of injury or disease, to work at any reasonable occupation.
>
>   You will not be deemed to be performing the material duties of your own occupation or working at a reasonable occupation on any day if:
>
> - You are performing at least one, but not all, of the material duties of your own occupation or you are working at any occupation (full-time or part-time); and
>
> - Solely due to disease or injury, your income from either is 80% or less of your adjusted predisability earnings."

62. Because the Denial cited a different definition of Total Disability, Ms. Port never had an opportunity to address the definition Aetna relied on in the Final Denial or to question the discrepancy between the terms Aetna relied on in the Denial and Final Denial.

63. The correct definition of Total Disability during the first 24 months (Own Occupation period) includes a significant additional condition, that the claimant be "unable to perform **with reasonable continuity** the substantial and material acts necessary to pursue your own occupation." (emphasis added.)

64. The correct definition of Total Disability after the first 24 months (the "any

occupation" period) includes significant additional conditions defining "any occupation." The correct definition of "any occupation" requires that the claimant be able to work "with reasonable continuity" at an occupation for which she "could reasonably be expected to perform satisfactorily in light of [her] age, education, training, experience, station in life, and physical and mental capacity," and places travel and distance restrictions on the occupations.

65. Although Ms. Port's appeal included her proof of loss for any-occupation benefits, the Final Denial does not address any of the relevant factors in the proper definition of Total Disability during the any occupation period.

66. In the Final Denial, Aetna again relied upon the review of non-examining consulting physicians.

67. In the Final Denial, Aetna acknowledged Ms. Port underwent cervical spine surgery on October 2, 2017.

68. Aetna's "Disability Appeal Consultant" stated, "Ms. Port has a long history of bilateral upper extremity pain and was receiving medication."

69. Aetna asserted, however, that although Ms. Port had the surgery on October 2, 2017, "which would have precluded her from performing any functional activities, *[Ms. Port] was not precluded from performing the material duties of her own occupation from May 19, 2017 [the date of Ms. Port's initial denial] through October 1, 2017*." (Emphasis added.)

70. Aetna's conclusions are internally inconsistent, and thus, illogical.

71. While Aetna conceded Ms. Port would have been "precluded" from "performing any functional activities," Aetna asserted Ms. Port "was not precluded from performing the material duties of her own occupation" for a period of approximately five months leading up to the surgery.

72. Aetna's conclusion regarding Ms. Port's functional capabilities immediately preceding her October 2017 neck surgery is nonsensical.

73. The very fact that this surgery occurred corroborates Ms. Port's symptoms and illustrates they are credible.

-8-

74. Aetna conceded Ms. Port was disabled for a three-month period following the October 2017 surgery, but it would not concede Ms. Port's symptoms precluded her from performing the substantial and material duties of her own or any occupation immediately prior to that surgery.

75. To this date, Ms. Port cannot perform the material duties of her Own Occupation or Any Occupation and, therefore, comes within the definition of Disability under the Plan.

76. Ms. Port has exhausted her administrative remedies and timely filed this lawsuit.

## COUNT I
### (Recovery of LTD Plan and LWOP Benefits)
### (Defendants Aetna and the Plan)

77. All other paragraphs are incorporated by reference.

78. The Plan is an Employee Welfare Benefit Plan as defined in ERISA, 29 U.S.C. § 1002.

79. The Plan provides for LTD coverage and a promise to provide LTD benefits until Ms. Port is no longer disabled under the terms of the Plan.

80. Ms. Port continues to be disabled from working in her "Own Occupation" or "any occupation."

81. Ms. Port has claimed the benefits under the Plan to which she is entitled.

82. Ms. Port reasonably expected that her medical conditions met the requirements of disability as defined by the Plan and that she would receive benefits under the Plan until she reaches her Social Security Normal Retirement Age or until she was no longer disabled.

83. Despite the coverage of Ms. Port's Disability, Aetna and the Plan improperly terminated her LTD benefits in breach of the Plan and ERISA.

84. Though Ms. Port was receiving LTD benefits for a period of almost two years prior to the May 2017 denial, Aetna failed to adequately explain how Ms. Port's conditions improved to the point she was able to perform all the material duties of her Own

1  Occupation

2  85. Aetna's and the Plan's conduct was arbitrary, capricious, an abuse of
3  discretion, not supported by substantial evidence, and clearly erroneous.

4  86. Ms. Port's claim is subject to *de novo* review because the Policy was issued in
5  California in 2015 and subject to California's ban on discretionary clauses.

6  87. Instead of evaluating a participant's eligibility based on the applicable plan
7  language and medical evidence, Ms. Port is informed and believes that Aetna makes claims
8  decisions based on the claims resources and financial risk it faces on certain claims.

9  88. Aetna wrongfully terminated Ms. Port's LTD benefits without providing a
10  coherent explanation for its decision, and in a way that conflicts with the plain language of
11  the Plan, violating 29 U.S.C. §§ 1109, 1132.

12  89. Aetna did not properly consider all of the available evidence when
13  terminating Ms. Port's benefits.

14  90. Aetna failed to conduct a full and fair review.

15  91. Aetna misstated medical evidence for its own financial benefit, *e.g.,* it
16  excessively relied on biased medical reviews provided by in-house medical consultants.

17  92. Aetna routinely emphasizes information that favors a denial of benefits while
18  deemphasizing other information that suggests a contrary conclusion.

19  93. Aetna failed to properly consider the opinions of Ms. Port's treating and
20  examining physicians.

21  94. In terminating Ms. Port's LTD benefits, Aetna completely disregarded
22  evidence that Ms. Port's conditions had not changed or improved.

23  95. Aetna has no evidence that Ms. Port's conditions changed or improved since
24  it determined that she met the definition of Disability under the Plan.

25  96. Upon information and belief, Aetna used in-house reviewers in evaluating
26  Ms. Port's claim, because it knew that the in-house reviewers' recommendations would be
27  unfavorable for the continuation of Ms. Port's benefits.

28  97. The peer reviewers arbitrarily reached their opinions based on insufficient

evidence or investigation.

98. Aetna engaged in other procedural irregularities, which it did to serve its own financial best interests.

99. On information and belief, Aetna engaged in claim discussions to decide the directions of appeals without having reviewed all of the medical evidence, demonstrating its predetermined path of terminating benefits.

100. On information and belief, Aetna's knowledge of The Hartford's imminent acquisition of its disability business influenced Aetna's decision to terminate Ms. Port's LTD claim, and others' claims, for the purpose of appearing more financially viable for purposes of the acquisition, or for some other purpose related to the acquisition, but which had nothing to do with the merits of Ms. Port's claim.

101. Aetna intentionally gathered evidence to support a decision to terminate Ms. Port's LTD benefits.

102. Ms. Port alleges upon information and belief that Aetna has a parsimonious claims handling history.

103. Aetna failed to conduct a "meaningful dialogue" regarding Ms. Port's claim.

104. Under the *de novo* standard of review, to be entitled to benefits Ms. Port need only prove by a preponderance of the evidence that she is disabled.

105. Under the *de novo* standard of review, Ms. Port is entitled to discovery regarding, among other things, the credibility of Aetna's medical reviews and Aetna's lack of partiality due to its financial conflicts of interest. *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) (under the *de novo* standard of review, new evidence may be admitted regarding, among other things: "the credibility of medical experts… [and] instances where the payor and the administrator are the same entity and the court is concerned about impartiality" (*quoting Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1026-27 (4th Cir. 1993)).

106. Pursuant to the coverage provided in the Plan, to ERISA 29 U.S.C. § 1132(a)(1)(B), and to applicable federal law, Ms. Port is entitled to recover all benefits due

under the terms of the Plan, and to enforce her rights under the Plan.

107. Ms. Port is entitled to reinstatement of any other employee benefits that were terminated, discontinued, or suspended as a result of the termination of her disability benefits, including but not limited to her LWOP benefits. She is entitled to a restoration of the *status quo ante* before LTD benefits were wrongfully terminated.

108. Pursuant to 29 U.S.C. § 1132(g), Ms. Port is entitled to recover her attorneys' fees and costs incurred herein.

109. Ms. Port is entitled to prejudgment interest on the benefits to which she is entitled and on her damages at the highest legal rate until paid.

## COUNT II
### (Breach of Fiduciary Duty)
### (Aetna and Hotchalk)

110. All other paragraphs are incorporated by reference.

111. Under 29 U.S.C. § 1132(a)(3), this Court may enjoin any act or practice that violates ERISA or the terms of the Plan, as well as grant other appropriate equitable relief, provided that such relief is not recoverable under 29 U.S.C. § 1132(a)(1)(B).

112. Aetna is a fiduciary and owes fiduciary duties to Plan participants, including Ms. Port.

113. Hotchalk is a fiduciary and owes fiduciary duties to Plan participants, including Ms. Port.

114. Under 29 U.S.C. § 1104(a), Aetna and Hotchalk are required to discharge their duties with the care, skill, prudence, and diligence under the circumstances that a prudent man acting in like capacity and familiar with such matters would use under 29 U.S.C. § 1104(a).

115. Under ERISA, which is founded in trust principles, Aetna and Hotchalk are required to administer claims in the best interests of beneficiaries and participants as part of their fiduciary duty.

116. In multiple ways throughout the administration of Ms. Port's claim, Aetna and Hotchalk breached their fiduciary duties pursuant to 29 U.S.C. § 1132(a)(3).

117. As examples of Aetna's and Hotchalk's breaches of fiduciary duty, they provided a summary of LTD benefits that contained incorrect information and changed the definition of Total Disability relied on during the appeal process.

118. Ms. Port is informed and believes Aetna breached its fiduciary duty by allowing the Hartford's acquisition of its disability business to unduly influence the claims process in her claim, as well as other claims.

119. Ms. Port is informed and believes that Aetna denied more claims in late 2017 as a result of the prospect of the Hartford's acquisition of its business. Discovery will reveal Aetna's strategy to deny more claims, which is a breach of fiduciary duty to Ms. Port causing her actual harm.

120. Aetna's arbitrary and capricious claims handling generally constitutes a breach of fiduciary duty, because Aetna's claims handling was discharged imprudently and caused Ms. Port serious harm that cannot be recovered under 29 U.S.C. § 1132(a)(1)(B).

121. To the extent that Aetna's LTD termination caused Ms. Port harm unrecoverable under 29 U.S.C. § 1132(a)(1)(B), then that harm is recoverable under 29 U.S.C. § 1132(a)(3).

122. On information and belief, Aetna instructs and/or incentivizes certain employee(s) to terminate fully-insured LTD claims and appeals based on bias or its financial interests.

123. Ms. Port is informed and believes that Aetna's employees are trained in administering claims in the best interests of Aetna, not Plan participants.

124. Aetna demonstrated bias and malice against Ms. Port through its employees. Instead of fully and fairly reviewing the medical evidence, Aetna unreasonably denied Ms. Port's claim based on unreliable evidence, such as the opinions of physicians who never personally examined Ms. Port.

125. Aetna's failure to act prudently and in the best interests of Ms. Port is a breach of fiduciary duty requiring appropriate equitable relief following discovery of Aetna's conduct as it relates to Ms. Port's claim.

126. Ms. Port is informed and believes that Aetna has targeted claims under the Plan, including Ms. Port's, which is a breach of fiduciary duty.

127. On information and belief, Aetna breached its fiduciary duty to Ms. Port by terminating her LTD and LWOP claims in an effort to avoid its financial liability.

128. For instance, Aetna denied Ms. Port ongoing benefits only three months before the transition of her claim from the "own occupation" phase to the "any occupation" phase of disability under the Policy.

129. On information and belief, Aetna denied Ms. Port with the knowledge that this Court—should it be inclined to hold in Ms. Port's favor—would remand for payment of benefits under the "own occupation" phase of the Policy, when a redetermination of disability under the "any occupation" phase would occur only a few months later.

130. On information and belief, Aetna could deny Ms. Port under the "any occupation" phase of the Policy immediately upon remand, costing Ms. Port years in the litigation process for only a few months of LTD benefits.

131. Hotchalk breached its fiduciary duties by failing to perform the fiduciary duties imposed by ERISA, including failure to monitor Aetna's claim handling, failing to insure Aetna performed its duties under the Plan, and failing to take prudent or appropriate corrective action.

132. Based on the facts of this case, Ms. Port has "other equitable relief" available to her in several forms, including but not limited to surcharge,[1] because the relief available under 29 U.S.C. § 1132(a)(1)(B) does not make Ms. Port whole for her losses from Aetna's and Hotchalk's breaching conduct.

133. The Court has broad discretion to fashion appropriate relief to make Ms. Port whole and should mold the relief necessary to protect the rights of the participants.

134. Ms. Port is entitled to injunctive or mandamus relief under 29 U.S.C. §

---

[1] A surcharge is a kind of equitable monetary remedy against a trustee, which puts the beneficiary in the position he would have attained but for the trustee's breach. Surcharge extends to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary.

-14-

1  1132(a)(3).

2  135.    She is entitled to enjoin any act or practice by Aetna and Hotchalk that
3  violate ERISA or the Plan, or seek other appropriate equitable relief that is traditionally
4  available in equity.

5  136.    Aetna was unjustly enriched as a result of its breach of fiduciary duty
6  violations, because it wrongfully withheld Ms. Port's benefits for its own profit.

7  137.    Aetna engaged in several procedural violations in an attempt to circumvent its
8  obligations under ERISA, which is conduct the Court can enjoin.

9  138.    Hotchalk failed to perform its fiduciary duties under ERISA and the Plan.

10  139.    Aetna acted with malice and in bad faith against Ms. Port, which constitutes a
11  violation of its fiduciary obligations.

12  140.    ERISA "does not elsewhere adequately remedy" the injuries caused to Ms.
13  Port by Aetna's and Hotchalk's breach of fiduciary duty violations.

14  141.    As a direct and proximate result of the breaches of fiduciary duty, Ms. Port
15  suffered actual, *significant* financial harm and has incurred financial expense.

16  142.    Ms. Port is entitled to prejudgment interest on the benefits to which she is
17  entitled and on her damages at the highest legal rate until paid in full.

18  143.    Pursuant to 29 U.S.C. § 1132(g), Ms. Port is entitled to recover her attorneys'
19  fees and costs incurred herein.

20  **WHEREFORE**, on all claims, Ms. Port prays for entry of judgment against
21  Defendants as set forth in this Complaint, which includes:

22  A.    All past LTD benefits under the terms of the Plan;

23  B.    Clarifying and determining Ms. Port's rights to future benefits under the
24  terms of the Plan, including the "any occupation" definition of disability under the
25  Plan;

26  C.    For any other benefits Ms. Port may be entitled to receive under the Plan due
27  to her disability;

28  D.    All other equitable relief that is proper as a result of Aetna's and Hotchalk's

-15-

breaches of fiduciary duty;

E. An award of Ms. Port's attorneys' fees and costs incurred herein;

F. An award of prejudgment interest on benefits and damages at the highest legal rate until paid; and

G. For such and further relief as the Court deems just, equitable, and reasonable.

Dated this 27th day of June, 2018.

OBER PEKAS RONSTADT

By: *s/ Kevin Koelbel*
   Erin Rose Ronstadt
   Kevin Koelbel
   Clayton W. Richards
   Attorneys for Plaintiff